REID, Judge.
This matter is a death action brought by Mrs. Letha Mae Searcy Crum, individually and for the benefit of her seven minor children as the administratrix of her husband’s estate, under what is commonly known as the Jones Act (46 U.S.C.A., Sec. 688). Plaintiff seeks to recover damages in the amount of $500,000.00' for the death of her husband, John Floyd Crum, who allegedly drowned during the course of his employment on a vessel known as “Number One” which was owned, maintained and operated by the defendant, Southshore Railway Company. Great American Insurance Company was also made defendant in the case, but was subsequently dismissed from the action by a summary judgment of the lower Court.
Plaintiff’s petition alleges that on and prior to July 15, 1966, her husband, John Floyd Crum, was employed by Southshore Railway Company as a member of the crew and as a seaman aboard the “Number One” and on said date, while in .the process of carrying out his duties aboard the said vessel, and while attempting to remove a piece of timber that was interfering with the operation of the vessel, he was thrown overboard and drowned. The petition further alleges that at the time of the accident the vessel was located in the waters of the Feliciana River, better known as Thompson Creek, beyond midstream on the western side, causing it to be in West Feliciana Parish, Louisiana; that the Thompson Creek is a tributary of the Mississippi River, an arm of the sea and navigable waters of the United States of America. Plaintiff further alleges that the vessel in question was unseaworthy in that it did not have proper railings and safeguards to protect the members of its crew; there were no life preservers, life rafts, ropes or other life-saving equipment aboard; the lighting was insufficient and ineffective; and that the defendant, Southshore Railway Company, through its personnel, knew that John Floyd Crum could not swim at the time he was hired to work aboard the vessel and knew that the deckhand, the only other member of the crew of the vessel, could not swim either, and there was no equipment of any kind furnished the members of the crew to keep them from drowning in the event they were caused to be thrown overboard.
Southshore Railway Company filed a de-clinatory exception alleging that the Court was without jurisdiction over the subject matter of the suit on the grounds that the alleged accident occurred while John Floyd Crum was working on a sand and gravel dredge in an enclosed man-made pond near United States Highway 61 and Thompson’s *102 Creek in East Feliciana Parish, and therefore he was not injured on the navigable waters of the United States, and that furthermore he was not a seaman and thus the action was not within the jurisdiction of the Jones Act, the law of admiralty or the general maritime law, and any action plaintiff might have must he under the Workmen’s Compensation Act of the State of Louisiana.
After propounding and answering numerous interrogatories, the exception to the jurisdiction over the subject matter was tried on September 5, 1968. By stipulation of counsel for both parties, various depositions, engineering drawings and surveys, and photographs were introduced into the record. Plaintiff offered excerpts from several books pertaining to Thompson’s Creek many years ago, to which counsel for defendant objected, the objection was overruled, and the offerings were admitted. After argument of counsel the declinatory exception was sustained, and judgment rendered in open court dismissing plaintiff’s suit at her cost. The judgment was read and signed on January 14, 1969.
Plaintiff applied for a new trial, which was taken up on January 22, 1969, and denied. On February 12, 1969, plaintiff was granted a devolutive appeal, returnable to this Court.
Plaintiff alleges the following specifications of error: (1) The trial Court erred in failing to apply the principle that once a stream is navigable it remains so; (2) the trial Court erred in failing to follow the jurisprudence controlling the circumstances shown herein; and (3) the trial Court erred in relying on jurisprudence which is not apposite.
In his written reasons for judgment the trial Judge found the following finding of fact:
“* * * The trial of the Exception was had on September 5, 1968, and by the stipulation of counsel for both plaintiff and defendant the depositions of Chal-mers McKowen, Alex McKowen, Stuart Johnson, Jerome M. Klier, Charles Hall and Walter Matthews, which had been taken at the request of the plaintiff on the first day of June, 1967, along with various engineering drawings and photographs, were introduced into the record to be considered by this Court as evidence for the purposes of the defendant’s Declinatory Exception. The only other evidence considered by this Court was the offering by the plaintiff, over the defendant’s objection, of excerpts from various books pertaining to and concerning Thompson’s Creek in the distant past.
“Considering the depositions, photographs, engineering drawings, and the excerpts from the various books, the following facts are uncontroverted: At the time of this accident on July 15, 1966, the decedent, John Floyd Crum, was employed by the defendant, South Shore Railway Company, as a dredge operator and South Shore was engaged in extracting sand and gravel by means of an electric powered hydraulic suction pump from the lands of Chalmers McKowen in the Parish of West Feliciana. The accident hereinafter described occurred in an enclosed man-made pond. As shown on the engineering drawings the pond in question is approximately three acres in 'size, and ranges from twenty to forty feet in depth, and is situated approximately two-thirds of a mile south of U. S. Highway 61 and approximately six hundred feet west of the water’s edge of Thompson’s Creek at its normal level, in the Parish of West Feliciana. The pond >was not created for any navigational purpose, but as a necessary by-product of South Shore’s hydraulic suction pump operation which it utilized to extract the sand and gravel from the lands adjacent to Thompson’s Creek and its only connection to the creek is by an overflow pipe which permits rain water to drain out of the pond toward the creek.
*103 “On the night of the accident the decedent was working on a dredge boat, identified as Dredge No. 1, which housed the pumping equipment and from which the same was operated. Crum was the dredge operator and he was being assisted by a deckhand, Walter Matthews. The evidence establishes that- the suction pump was encountering some limbs near the bank of the pond and Crum requested his subordinate deckhand to operate the dredge while he went to the bank in the work boat, and got an axe from Matthews’ truck, then proceeded in the work boat to the area where the suction was encountering these limbs. Standing in the work boat or skiff, he began to chop at limbs and when the second of two limbs was cut he lost his balance, fell in and drowned. Although there had been in the past, there were no life preservers on the dredge at the time of the accident.
“For the purposes of this exception the sole issue is whether there is jurisdiction under the Jones Act.”
With this finding of fact, this Court is in agreement. An examination of the record shows that the accident happened in an enclosed man-made pond, of the size and at the location as set forth in the trial Judge’s finding of fact quoted above. Therefore, the question revolves around the sole issue of whether under the facts, as found by the trial Judge and with which this Court is in agreement, the Court has jurisdiction under the Jones Act.
The trial Judge found as a conclusion of law that the record showed the accident did not occur upon navigable waters of the United States and the decedent was not a seaman within the intent of the Jones Act, and, therefore, the defendant’s exception of lack of jurisdiction over the subject matter must be sustained. In reaching this conclusion the trial Judge again emphasized :
“* * * It is clear that the pond is not navigable, within any accepted definition of that term, nor was it created for any navigational purpose, nor is it connected with any body of. water so as to permit the passage of boats of any size or to permit the conduction of commerce under the normal modes of travel and trade on water. Therefore, even if it be assumed that Thompson’s Creek is navigable, which fact is in dispute, the law seems to be clear that this man-made pond on privately owned lands is not a navigable stream within the meaning of the Jones Act and general maritime law.”
This Court agrees with this finding by the trial Judge.
The lower Court felt that the case of United States v. Ross, D.C., 74 F.Supp. 6 (1947), was a case with a factual situation most similar to the present case. In that case the defendant was charged with a violation of Section 526m of Title 46, U.S.C. A., in that he “knowingly, willfully and unlawfully * * * did operate [a motorboat] in a wreckless and negligent manner so as to endanger the lives * * * of divers persons * * *.” That case was submitted on an agreed statement of facts and presented two issues, one of which is relevant in connection with the exception in the case at bar, that is, did the Court have jurisdiction over the subject matter by reason of the fact that the acts complained of by the government took place on navigable waters of the United States. In the Ross case the Court found the following facts pertinent in deciding the issue:
“More than 10 years ago a drainage district built and has since maintained a levee along the west side of the Mississippi River in Lincoln County, Missouri. The levee district included lands immediately west of the Mississippi River. From the land of the drainage district soil was taken to construct the levee leaving a borrow pit east of the levee between the levee and the Mississippi River. The pit extends several miles parallel with the levee. This borrow pit varies in width from 50 feet to 200 feet and *104 in distance from the Mississippi River from 10 feet to 100 feet. The land between the borrow pit and the Mississippi River contains vegetation and brush. There are two openings from the borrow pit to the river. They will permit an outboard motorboat to pass from the borrow pit to the Mississippi River ‘by using an oar or pole, but not the motor’. The openings are approximately 6 feet wide and 20 feet long and at ‘normal’ stage of the river have a depth of ‘about 3 feet of water’ but this depth increases and decreases as the stage of the river changes. There are occasions when the river is below normal, when there is no water in either of the openings. The borrow pit is 6 or 7 feet at maximum depth. In flood stage of the Mississippi River the land between the river and the borrow pit is entirely submerged. On the borrow pit defendant was maintaining a boat dock located about 900 feet from one of the openings, from the river to the borrow pit. Defendant used the dock during the duck season and on other occasions, ‘approximately 12 times annually’. He had used the dock for a year prior to the incident resulting in the charge. Defendant’s father used the dock for the same purpose for 7 or 8 years. There is no evidence of any other use having been made of the borrow pit or the openings between the borrow pit and the river. Defendant’s boat was constructed of wood, between 19 and 20 feet long, 5 feet wide, 18 inches deep, with a scow bow and square stern, powered by a 16 horsepower outboard motor. Defendant used the boat during the duck season to transport hunters to an island in the Mississippi River. He loaded his boat with 10 duck hunters and had proceeded about 100 feet from the landing when the boat sank, resulting in the death of three of the passengers and the pending charge. The defendant would have had to travel at least 800 feet further in the borrow pit before reaching the opening to pass from the borrow pit into the Mississippi River and thence to the island to discharge the hunters.”
'After citing numerous cases where the question of navigability was raised, the Court in the Ross case said that the record was completely insufficient to show that the borrow pit in Lincoln County was ever used by anyone for navigation purposes except the defendant and his father, and that they used it only during the hunting season to transport duck hunters from their dock on the borrow pit to an island in the Mississippi River. The Court then pointed out that the outboard motor rig used by the defendant drew only 18 inches of water and the passage from the borrow pit to the Mississippi River had to be made by “using an oar or pole.” It was further observed by the Court that in the dry season there was no water in the passage and, in denying the waters were navigable, the Court said:
“ * * * A portion of the borrow pit ‘North of the boat dock * * * is not capable of use by motorboat at “pool” stage, by reason of the presence of stumps and debris.’ To hold that the borrow pit, under the admitted facts, is navigable water of the United States would be to stretch the term to include every body of water, natural or artificial, which has any character or connection with a navigable stream through which a small boat can be pushed by oar or pole. We know of no authority to sustain such a holding * *
The Ross case cited in support of its conclusion, Kerr v. West Shore R. Co., 127 N.Y. 269, 27 N.E. 833, 835; State ex rel. Matson v. Superior Court of Skagit County, 42 Wash. 491, 85 P. 264.
It should be pointed out that the facts in the present" case are stronger than the facts in the Ross case because in this case the record shows the only connection between the pond and the creek was by an overflow pipe which permitted the excess rain water to drain out of the pond and into the *105 creek, and the record does not disclose that there was any actual outlet other than that.
The plaintiff tries to distinguish the Ross case upon three propositions, namely: that in this case the pond was in the creek bed of Thompson’s Creek, which was not true of the borrow pit in the Ross case; that Thompson Creek has been shown to be navigable in the past; and that the case of Senko v. LaCrosse Dredging Corporation, 16 Ill.App.2d 154, 147 N.E.2d 708 (1957), impliedly overruled the Ross case.
As to the first contention, the Trial Court in the present case held that the pond in question was a completely enclosed pond and the record completely fails to substantiate the plaintiff’s claim that the pond was in Thompson’s Creek.
Plaintiff’s second contention is that Thompson’s Creek has been shown to be navigable in the past. The evidence presented by plaintiff as to whether or not Thompson’s Creek has been navigable is at best doubtful, and in view of the holding of the trial Court, with which this Court has agreed, plaintiff’s argument is inapplicable in the instant case.
As to plaintiff’s third contention, that the Senko case impliedly overruled the Ross case, it is without merit. The Court held in that case that the dredging operation was on navigable waters, and that while it was true that that part of the backwaters of the Mississippi called Gabar-et Slough had not previously been used for navigation, it was nevertheless being dredged out to provide a pass around a rocky portion of the river, one end opening on the river and the other on a canal connected to the river. In holding that the dredge was on navigable waters, the Court pointed out that the dredging operations were turning those waters into a part of the interstate route of the Mississippi River.
The situation in the Senko case was the same as in the case of McKie v. Diamond Marine Co., 204 F.2d 132 (5th Cir.1953), also cited by the plaintiff, which latter case is also inapplicable. In that case it was clear that the channel in which the dredge had been working was a navigable channel and all the dredge was doing was making the channel deeper by removing the timber, and it was actually working in aid of navigation.
Another case cited by the trial Judge which this Court feels is applicable herein is the case of Ingram v. Associated Pipeline Contractors, Inc., 241 F.Supp. 4 (1965). In that case the Court found the facts clearly showed that plaintiff’s deceased husband had been laying a pipeline across False Bayou, which was a landlocked bayou lying between the northern end of False River and the Mississippi River, about six miles east of New Roads, Louisiana; that False Bayou was separated from False River by State Highway 413, the Texas-Pacific Railway, and some open farm and pasture land; that it was separated from the Mississippi River by State Highway 415 and the Mississippi River levee; that it was cluttered with trees, water hyacinths and other vegetation growing therein; and that it was approximately three miles long, completely landlocked, and contained practically no open water. The Court then held there was no question but what this body was not then navigable-in-fact within any accepted definition of that term. In that case the Court held that False River had been declared to be non-navigable (see 33 U.S.C.A., Sec. 2.99-1, 2.99-100) and that if False River is non-navigable, then a fortiori, False Bayou must also be non-navigable. The Court then held that False Bayou was not in fact nor in law a navigable waterway.
Many other cases are cited by both plaintiff and defendant in their briefs concerning the question of what is and what is not navigable, and the question as to whether or not once a waterway is found to be navigable it forever remains navigable, or does it have to remain navigable in fact, and while this Court does not question the cases cited, in view of the finding *106 of fact by the trial Judge, with which this Court is in agreement, it is not felt that it is necessary to go into a detailed discussion of the issues raised in those cases.
As previously stated, this Court is in agreement with the trial Court’s reasons for judgment and would feel that under the Louisiana jurisprudence the rule that unless the trial Judge is manifestly erroneous in his findings of fact, they will not be disturbed. In this case, however, the trial Judge’s findings are given even greater weight than in an ordinary case, as stated by this Court in the case of Presley v. Upper Mississippi Towing Corporation, La.App., 141 So.2d 411:
“The rule obtaining in this state in accordance with Article 7, § 29 of the Louisiana Constitution of 1921, LSA, is that the Appellate Courts of Louisiana may hear appeals on both facts and law and may reverse a lower court on a finding of fact when such factual determination is deemed erroneous. Such rule, however, does not apply to a claim under the Jones Act tried in the courts of this State. In Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493, in reversing the decision of the Supreme Court of Missouri which set aside an award in a FELA case on the ground that plaintiff’s ¡proof did not establish defendant’s liability, the Supreme Court of the United States held that under the circumstances the judicial right of review of facts is restricted to the single inquiry of whether, within reason, the evidence adduced supports the conclusion that the negligence of the employer played any part at all in the injury or death of the employee. In cases under the Jones Act appellate courts can and should reverse the judgment of a trial court in the event of erroneous rulings by the lower tribunal on questions of law such as erroneous instruction to the jury regarding the rules and law applicable in such cases unless it affirmatively appears from the record as a whole that such errors were harmless. Fellipon v. Albion Vein Slate Co., 250 U.S. 76, 39 S.Ct. 435, 63 L.Ed. 853, and United States v. River Rouge Imp. Co., 269 U.S. 411, 46 S.Ct. 144, 70 L.Ed. 339; Majestic v. Louisville & N. R. Co., 6 Cir., 147 F.2d 621.”
It is certainly clear that the finding of facts by the trial Judge in this case should not be disturbed by this Court and it is amply clear, as stated above, that the applicable law has been applied to the facts by the trial Judge.
For the above and foregoing reasons, the judgment of the trial Court is affirmed, at appellant’s cost.
Affirmed.